CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

7/15/2022
JULIA C. DUDLEY, CLERK
BY:   s/ A. Little
        DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

|  |  |
|---|---|
| JANUARY CREWS-SANCHEZ, | CASE NO. 6:21-cv-00030 |
| *Plaintiff*, |  |
| v. | MEMORANDUM  OPINION |
| FRITO-LAY, INC., |  |
| *Defendant*. | JUDGE NORMAN K. MOON |

This matter is before the Court on Defendant Frito-Lay, Inc.'s motion for summary judgment on discrimination and retaliation claims filed by its former employee, Plaintiff January Crews-Sanchez. For the reasons set forth below, the Court concludes that Plaintiff has presented no genuine dispute of material fact that would preclude the Court from awarding summary judgment to Frito-Lay. The Court therefore will enter summary judgment in favor of Frito-Lay.

<u>Background</u>

The following facts are taken from the summary judgment record and are uncontested or viewed in the light most favorable to Plaintiff January Crews-Sanchez, as the non-movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Plaintiff had worked for Frito-Lay since 2006, as an Environmental Health & Safety Manager (or "EHS Manager"). Dkt. 28-1 at 40:19 – 41:3 ("Pl's Dep."). [1] As EHS Manger, Plaintiff was responsible for, among other things, OSHA, EPA, and regulatory compliance at the Frito-Lay facility in Lynchburg. *Id.* at 47:8 – 48:9. Plaintiff testified that, generally, her

---

[1] Frito-Lay is a subsidiary of PepsiCo.

responsibility "was to maintain compliance," and to ensure employees were following "all of the safety rules and regulations." *Id.* at 47:8-19.

Starting in March 2020, Plaintiff also became responsible for various COVID-19-related job duties. *Id.* at 58:1 – 60:17. "[A]t the beginning of the pandemic," her responsibilities in this regard "were changing daily." *Id.* at 58:4-5. Among other things, Plaintiff was responsible for disseminating Frito-Lay's COVID-19 procedures to its employees at the facility, managing supplies of personal protective equipment (or "PPE") (including buying, distributing, and housing the PPE), putting up markers and barriers and organizing seats and furniture to ensure social distancing, handwashing and sanitizer stations, outside tents, finding and training "24-hour nurses" or others to operate temperature scanners, putting up posters, and other related tasks. *Id.* at 58:4 – 60:17. Plaintiff was also responsible for ensuring compliance with any mandates or CDC guidelines, *id.* at 60:18 – 61:2, overseeing compliance with masking, social distancing, contract tracing procedures, and ensuring that COVID-19 safety precautions were followed, *id.* at 61:14-16, 62:8-10. She explained that "it was a lot of physical labor because it was a lot of things you had to physically roll out," *id.* at 60:7-9, and that all of that had to be done on-site, *id.* at 61:12-13. Plaintiff's responsibilities to ensure compliance with Frito-Lay's COVID-19 safety precautions continued until July 2020. *Id.* at 63:13-21.

Around March 22, 2020, Plaintiff submitted a letter from her doctor to Aubrey Wells (the Site Director of Frito-Lay's Lynchburg facility) and Jessica Fowler (Human Resources Manager at Frito-Lay's Lynchburg facility). *Id.* at 248:2 – 249:12. Plaintiff testified that she has "an immune deficiency disorder," and "when COVID hit, my doctor sent a note saying that, if possible, I needed to be able to work from home," rather than on-site. *Id.* at 173:16 – 17:14. The letter stated:

To Whom It May Concern:

Ms. Crews-Sanchez is a patient under my care. She has an immunocompromising condition and should be allowed to work from home to maximize social distancing during the current COVID-19 pandemic. Please feel free to contact me with any questions.

Sincerely,

Stacy Park, MD
Internal Medicine
University of Virginia Health System

Dkt. 27-17. Plaintiff "never got a response from either one of them," *i.e.*, from Aubrey Wells or Jessica Fowler. Pl's Dep. at 173:21 – 174:1.

Three-and-a-half months later, on July 4, 2020, the Lynchburg minor league baseball team, the Lynchburg Hillcats, held a charity baseball game for senior high school baseball players. *Id.* at 66:1-14, 67:19 – 68:2. It was called the "Ronnie Roberts Senior Classic." Dkt. 27-8 at 1. One participant at that game was "C.D.", who was also a Frito-Lay employee. Pl's Dep. at 67:9 – 68:2. At the time of that game, Plaintiff testified that C.D. was "on quarantine for coming in contact with a [COVID-19] positive person." *Id.* at 69:10-16. C.D.'s father, T.D., also worked at Frito-Lay at that time. Both father and son had been in "close, unmasked contact greater than 15 minutes with a … confirmed positive individual," and so Plaintiff testified that "we at that time quarantined [C.D. and T.D.] … just to see if they ever showed any symptoms." *Id.* at 80:8-14. As Plaintiff described, "[w]e just quarantined them on that Friday," and then "[C.D. and T.D.] went to that baseball game on Saturday …." *Id.* at 80:11 – 81:5. The Lynchburg News & Advance newspaper carried a story about the Ronnie Roberts Classic, which included a photo of C.D. playing at that game. *See* Dkt. 27-8 at 5.

The following Tuesday morning, July 7, 2020, Plaintiff emailed the President and General Manager of the Hillcats, Chris Jones, asking "Can someone please contact me regarding

the Ronnie Roberts classic from this past weekend." Dkt. 27-9 at 2. Mr. Jones responded, "Can I

help you with something?" *Id.* Plaintiff followed up by asking simply, "Were the players asked

to sign a COVID waiver before playing?" *Id.* Mr. Jones replied, "[w]e sent a Liability form to

each coach to have each player or parent sign. Can I ask why you are asking?" *Id.* at 1. Plaintiff

responded: "I am the environmental health and safety director for Frito-Lay and we recently

placed an employee on quarantine for COVID and he was observed playing in the game. If you

would like to contact me my number is …" *Id.*[2]

Mr. Jones called Plaintiff and she explained to him that "[she] knew one of his players

was on quarantine for having come in contact with a positive person." Dkt. 27-10 at 1. He asked

for the player's name and Plaintiff told him it was C.D. (but using C.D.'s name). *Id.* Plaintiff did

not name the person who had tested positive for COVID-19, with whom C.D. had been in close

contact. *Id.*

Mr. Jones called Plaintiff back a short time later, after he spoke with C.D.'s father, T.D.

*See* Pl's Dep. at 83:6-15, 85:6-17. T.D. had relayed to Mr. Jones that he and C.D. "were not on

quarantine the weekend before" the game, and that T.D. "was upset." *Id.* at 85:13-21; *see also*

Dkt. 27-10 at 1-2 ("Chris claimed that the coach had reached out to [T.D.] and today said he was

quarantined for a different reason," that it "was just a Frito-Lay thing," and he said "something

about his constitutional rights and HIPAA."). Mr. Jones asked Plaintiff to give him the scenario

that caused then to place the employee on quarantine. Plaintiff described the situation using a

hypothetical "Employee A" who was the COVID-19 positive employee who had been coming

into work, and that, based on contact tracing, they "quarantined [C.D.] because of his direct

---

[2] While Plaintiff stated she was the Environmental Health and Safety Director for Frito-Lay, that was a position several rungs more senior than her position as EHS Manager. Dkt. 27-3 at 28:24 – 29:9 ("Wells Dep.").

contact observed with the positive person." *Id.* at 2. Plaintiff also told Mr. Jones that C.D. had

traveled recently to Myrtle Beach, South Carolina, which was then a COVID-19 "hot spot." Pl's

Dep. at 69:16 – 70:14.

Plaintiff testified that she contacted Mr. Jones because she "felt [she] was responsible"

for doing so, "[b]ecause the employee was supposed to be quarantining and was not

quarantining." *Id.* at 70:15-21. Plaintiff also testified that she "was getting a lot of complaints

from managers and employees that the employee was engaging in at-risk behavior," one of

which was Aubrey Wells. *Id.* at 70:21 – 71:7.

According to Plaintiff, after this call she went to talk to Jessica Fowler and Aubrey

Wells. Pl's Dep. 83:20 – 84:1, 86:12 – 87:16. Plaintiff testified that she told them that she had

"reached out to the general manager of the Hillcats," and relayed "the gist of our conversation

about [C.D.] being on quarantine because he came into contact with a COVID-positive

individual and that there [were] some concerns that he may have contaminated some employees

…." Pl's Dep. 91:7 – 92:2. Plaintiff told them about both conversations she had with Mr. Jones.

*Id.* 87:12-14. Plaintiff testified that she "just said [she] reached out to him," *i.e.*, Mr. Jones.

Plaintiff testified that she did not tell Ms. Fowler or Ms. Wells that she did not know how Mr.

Jones got her phone number. *Id.* 93:18 – 94:10.[3] On the other hand, Ms. Wells testified that,

during this meeting, Plaintiff had told them that *Mr. Jones reached out to Plaintiff* about his

concerns regarding team members that played that were on quarantine. Wells Dep. at 27:13-23.[4]

Plaintiff's conversation with them lasted ten to fifteen minutes. Pl's Dep. at 122:12-20.

---

[3] *See also* Pl's Dep. at 224:21 – 225:7 (Plaintiff, testifying that she "was never asked who
contacted who first or how contact was made with Mr. Jones."); *id.* at 225:8-15 (stating she did
not lead Ms. Wells and Ms. Fowler to believe Mr. Jones initiated contact).

[4] Ms. Fowler and Mr. Wells wrote statements following these conversations in which
they both wrote that Plaintiff had told them Mr. Jones had initiated contact with her. Dkt. 27-12

After that meeting, Plaintiff gave Ms. Wells Mr. Jones's phone number. Separately, Plaintiff texted Mr. Jones to let him know that Ms. Wells was going to be calling him. *Id.* at 125:10-13. Ms. Wells attested that she spoke with Mr. Jones a few minutes after she met with Plaintiff. *See* Dkt. 27-6 ¶ 3; Wells Stmt. at 2. Ms. Wells introduced herself and told Mr. Jones that she was reaching out about why he contacted Plaintiff—Mr. Jones "immediately let [Ms. Wells] know [Plaintiff] initiated contact. He said she sent him an email in the morning." Wells Stmt. at 2. Ms. Wells asked for a copy of the email and Mr. Jones forwarded it to her. *Id.*; *see also* Dkt. 27-6 ¶ 3.[5]

Later that same day (July 7, 2020), Plaintiff had another conversation with Ms. Fowler and Ms. Wells. Pl's Dep. at 123:4-6. Ms. Fowler asked Plaintiff if she would like to change her statement to them about her conversation with Mr. Jones. *Id.* at 123:8-14. Plaintiff responded that she didn't understand what Ms. Fowler was talking about. *Id.* at 123:13-14. Ms. Fowler told Plaintiff that Mr. Jones had sent them Plaintiff's emails to him. *Id.* at 123:14-16. After Plaintiff stated that she had nothing she wanted to disclose, Ms. Fowler said that Plaintiff was being suspended at that time pending further investigation, and that Plaintiff should go home and write a statement about the timeline of events related to her communications with Mr. Jones. *Id.* at 123:18 – 124:5; *see also* Dkt. 28 at 4.

In Plaintiff's subsequent written statement dated later that day, Plaintiff wrote that that she felt that it was her responsibility given public health concerns about COVID-19 "to make the

---

at 1 ("Throughout the conversation [Plaintiff] said several times that she didn't know how Chris [Jones] got her number") ("Wells Stmt."); Dkt. 27-11 at 1 ("[Plaintiff] informed me she received a phone call from … the General Manager of the Hill Cats … [s]he said she had no idea how he received her phone number, but they had two conversations.") ("Fowler Stmt.").

[5] While Plaintiff disputed that she told Ms. Wells and Ms. Fowler initially that Mr. Jones had been the one to initiate contact, she was not present for Ms. Wells' subsequent call with Mr. Jones and has not introduced contrary evidence or otherwise challenged the content of that call.

Hill Cats aware of the risk" from C.D.'s playing in the Ronnie Roberts Classic, and so she "emailed the general manager of the team and asked him to reach out to [her] regarding the game …." Dkt. 27-10. In her written statement, Plaintiff acknowledged that she had shared C.D.'s full name with Mr. Jones, however, she stated that she "did not name the [COVID-19] positive person." *Id.* at 1.

On July 10, 2020, Ms. Wells and Ms. Fowler met with Plaintiff to give her a notice terminating her employment. *See* Dkt. 27-13 (entitled, "Termination for Code of Conduct Violation"); Pl's Dep. at 207:14-20. The notice stated that, "on July 8, 2020, Jessica Fowler and [Aubrey Wells] conducted a thorough investigation after being notified that [Plaintiff] sent an email to a third party disclosing highly confidential information. In addition to substantiating the allegation, during the investigation [Plaintiff] violated the Company's Global Code of Conduct by misrepresenting important details of the allegations." *Id.* The notice stated that Frito-Lay's Global Code of Conduct required "all associates … to strive to act with honesty, fairness, and integrity," however, "[b]ased on the results of our investigation combined with [Plaintiff's] lack of honesty"—"a clear Code violation"—Plaintiff's employment was terminated. *Id.* Ms. Fowler read the termination notice to Plaintiff during the meeting, and when Plaintiff asked what code of conduct violation was referring to, Plaintiff was told confidentiality. Pl's Dep. at 210:15-21. Plaintiff added that nothing that was said during this meeting gave her cause to believe she was being terminated on account of her disability, or as retaliation for her asking to work from home. *Id.* at 217:9-17.

Plaintiff was subject to the National Salaried Associate Employee Handbook that states, in relevant part, that

> Any behavior that … undermines, or is inconsistent with our values as an organization, is unacceptable and will not be tolerated. The PepsiCo Code of Conduct and Associate Performance Standards are nonexhaustive lists of

workforce expectations to protect rights, safety, and welfare of our employees, customers and consumers in the efficient operation of our business.

…

You can be assured that disciplinary action will only be taken when an investigation of the facts shows that it is justified … The following … are examples of employee conduct which are not permitted and will subject an employee to corrective action—which can include immediate dismissal.

- Violation of Company policy, including but not limited to, the PepsiCo Code of Conduct …

- Submitting (verbally, electronically, or in writing) false or inaccurate information to the company for any reason … [including] information provided during the course of an investigation or audit[.]

Dkt. 27-15 at 29–30.[6]

Ms. Wells testified that the identify of an employee who had been exposed to COVID was information that the company treated as confidential in 2020. Wells Dep. at 24:18 – 25:10. Ms. Fowler also testified that Plaintiff's describing C.D. as being on quarantine by Frito-Lay violated its confidentiality rules. Dkt. 27-4 at 33:4-15 ("Fowler Dep."). Indeed, Plaintiff herself characterized that as a "mistake."[7] Ms. Wells also testified that she concluded that Plaintiff had misrepresented the "entire sequence of events," *i.e.*, the timeline of her communications with Mr. Jones, and also by stating that she was the Director of Environmental Health and Safety for Frito-Lay, which was a higher position than she had, *i.e.*, an Environmental Health & Safety Manager. *See* Wells Dep. at 28:24 – 29:9.

---

[6] *See also* Dkt. 27-16 at 11–12 (Lynchburg addendum, stating that "[l]ying or falsifying information of any kind," or a "[v]iolation of Company policy, including … the PepsiCo Code of Conduct" is a "level one violation" that "can result in termination of employment on the first offense").

[7] *See* Wells Stmt. at 3 ("[Plaintiff] stated that she only made 1 mistake in her career and wasn't sure why that should take her to termination."); Pl's Dep. at 209:9-19.

Plaintiff testified that she believed that Frito-Lay discriminated against her on the basis of a disability because her request for an "accommodation was ignored and then [she] subsequently was terminated." Pl's Dep. 265:11-21, 266:9-19. Plaintiff also testified that she believed Frito-Lay retaliated against her for reporting a purported workplace safety violation, *i.e.*, for reporting that C.D. had violated quarantine rules, and for being a whistleblower. *Id.* at 266:20 – 269:4.

In May 2021, Plaintiff filed suit against Frito-Lay in this Court. Dkt. 1 ("Compl."). Plaintiff brought six causes of action against Frito-Lay: Retaliation, in Violation of Va. Code § 40.1-51.2:1 (Count One), *id.* ¶¶ 38–46; "Whistleblower Retaliation," in violation of Va. Code § 40.1-27.3 (Count Two), *id.* ¶¶ 47–51; Failure to Accommodate, in violation of the ADA (Count Three), *id.* ¶¶ 52–57; Discrimination and Retaliation, in violation of the ADA (Count Four), *id.* ¶¶ 58–67; Discrimination, in violation of the ADEA (Count Five), *id.* ¶¶ 68–75; and Interference with Plaintiff's rights under ERISA § 510 (Count Six), *id.* ¶¶ 76–80.

In May 2022, Frito-Lay filed a motion for summary judgment. Dkt. 26. In response to the motion, Plaintiff stated that she would not seek to advance her ADEA or ERISA claims. Dkt. 28 at 1; Dkt. 29 at 1. The parties briefed whether Frito-Lay should be awarded summary judgment on Counts One through Four, which remain. Dkts. 28, 29. The Court heard argument on Frito-Lay's motion for summary judgment, which is ripe for decision.

Standard of Review

"Summary judgment is appropriate only if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (quoting Fed. R. Civ. P. 56(a)). "The party seeking summary judgment bears the initial burden of demonstrating that there is no genuine issue of material fact." *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (citing

9

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Libertarian Party of Va. v. Judd*, 718 F.3d 307, 312–13 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Judd*, 718 F.3d at 313 (quoting *Henry v. Purnell*, 652 F.3d 524, 528 (4th Cir. 2011) (en banc)). "Once the movant has made this threshold demonstration, the nonmoving party, to survive summary judgment, must demonstrate specific, material facts that give rise to a genuine issue." *Sedar*, 988 F.3d at 761 (citing *Celotex Corp.*, 477 U.S. at 323). A non-movant's position must be supported by more than "the mere existence of a scintilla of evidence" or "conclusory allegations or denials," to "preclude granting the summary judgment motion." *Id.* (citations omitted).

In ruling on a motion for summary judgment, the court must "adhere to the axiom that … '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 572 U.S. at 651 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" ruling on summary judgment. *Anderson*, 477 U.S. at 255. By contrast, a "judge's function" in ruling on a motion for summary judgment is not "to weigh the evidence and determinate the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Accordingly, the court "may grant summary judgment only if it concludes that the evidence could not permit a reasonable jury to return a favorable verdict." *Id.*

<u>Reasoning</u>

Plaintiff has raised four claims: failure to accommodate, and discrimination and retaliation, in violation of the ADA (counts three and four), retaliation in violation of Va. Code

§ 40.1-51.2:1 (count one), and whistleblower retaliation, in violation of Va. Code § 40.1-27.3

(count two). The Court first will consider Plaintiff's federal claims before proceeding to

Plaintiff's claims under Virginia law.

    1.    *ADA - Failure to Accommodate*

The ADA "generally prohibits employers from 'discriminat[ing] against a qualified

individual on the basis of disability.'" *Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 959

(4th Cir. 2021) (quoting 42 U.S.C. § 12112(a)). "One form of discrimination is failing to make

'reasonable accommodations' for a disabled employee's 'known physical or mental limitations,'

unless the employer 'can demonstrate that the accommodation would impose an undue hardship'

on its business." *Perdue*, 999 F.3d at 959 (quoting 42 U.S.C. § 12112(b)(5)(A)). To establish a

failure to accommodate claim under the ADA, a plaintiff must show: (1) that she suffers from a

disability; (2) her employer knew of her disability; (3) that a reasonable accommodation would

permit her to perform the essential functions of the position; and (4) her employer refuses to

make the reasonable accommodation. *Id.*[8]

A "reasonable accommodation" is a "[m]odification[ ] or adjustment[ ] to the work

environment, or to the manner or circumstances under which the position held or desired is

customarily performed, that enable an individual with a disability … to perform the essential

functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii). The ADA includes a non-exhaustive list

of examples: "job restructuring, part-time or modified work schedules, reassignment to a vacant

position, acquisition or modification of equipment or devices, appropriate adjustment or

_____

[8] Because a "failure-to-accommodate claim requires no evidence of discriminatory intent," the *McDonnell Douglas* test—which "address[es] legitimate business reasons and pretext to infer intent"—is "irrelevant" and "does not apply" to a failure-to-accommodate claim. *Perdue*, 999 F.3d at 959 n.2.

modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, [or] other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B). "To carry her burden on summary judgment, [Plaintiff] need only present evidence from which a jury may infer that the identified accommodation is reasonable on its face, *i.e.*, ordinarily or in the run of cases." *Perdue*, 999 F.3d at 960 (cleaned up) (citation omitted). In any event, even if the plaintiff establishes the element of a *prima facie* claim, an employer can still defeat the claim by demonstrating that the reasonable accommodations would impose an undue hardship. *Id.* at 959 (citing *US Airways, Inc. v. Barnett*, 535 U.S. 391, 395 (2002)).

Plaintiff argues that she has satisfied the elements of a *prima facie* case for failure to accommodate under the ADA. Dkt. 28 at 23. Indeed, Plaintiff contends that "the exact same accommodation"—being able to work from home—"was routinely given to the other members of management in Lynchburg at the same time." *Id.* She also faults Frito-Lay for not "engag[ing] in an interactive process … to determine whether there is a reasonable accommodation and what it would be." *Id.* at 24. By contrast, Frito-Lay argues that Plaintiff has not established being able to work from home was a reasonable accommodation. Dkt. 27 at 13. The inquiry proceeds in "two steps": First, the Court considers whether "the specific accommodation requested by [Plaintiff] was reasonable?", and second, the Court considers, "had [Frito-Lay] granted the accommodation, could [Plaintiff] perform the essential functions of the position?" *See Jacobs v. Admin. Office of the Courts*, 780 F.3d 562, 580 (4th Cir. 2015). The answer to both questions is plainly no, and therefore the Court concludes that Plaintiff has not established the third element of her *prima facie* case for failure to accommodate.

Indeed, according to Plaintiff's own description of her responsibilities, she was required to be on-site to accomplish them. For instance,

- Plaintiff managed an "emergency response team" that would act in the event of an emergency at the facility. Plaintiff testified she needed to be on-site if there was an emergency to manage the situation. Pl's Dep. at 48:16 – 49:2.

- Plaintiff managed PPE and safety equipment. Plaintiff testified she needed to be on-site to determine whether any such equipment was insufficient, or whether different equipment was needed. *Id.* at 49:3-12.

- Plaintiff oversaw trainings for "lockout" and "tagout" procedures and would do so on-site. *Id.* at 50:3-17.

- Plaintiff is a trained EMT, and so would on occasion be required to provide EMT care on-site in the event of an employee's injury. *Id.* at 50:18 – 51:5.

- Plaintiff was responsible for "identifying and evaluating hazards," and "implementing effective controls or corrective solutions," and Plaintiff testified that she needed to be on-site to fulfill those responsibilities. *Id.* at 52:4 – 53:1. Plaintiff further agreed that these were "major tasks" and "key responsibilities" that she as the EHS manager was "required to do." *Id.* at 52:4-9.

- Plaintiff testified that she was responsible for all kinds of physical, on-site duties related to making the site safe and to ensure compliance with any CDC or other COVID-19 related health guidelines, including

  o Distributing PPE to employees

  o Storing PPE in Plaintiff's office

  o Setting up tables, chairs and other furniture that would comply with social distancing rules

  o Setting up portable handwashing and sanitizing, and mask stations and protective equipment on doors and handles

  o Setting up temperature scanning stations at the front door

  o Putting up posters and other measures to ensure people walked through the facility in a way to prevent crowding or close contact

*See id.* at 58:4 – 61:16. Plaintiff's deposition testimony was very clear. Defense counsel asked,

"… All of the things that you mentioned, the meeting with the temperature scanners, making

sure that there were barriers up for the social distancing, managing all of the PPEs, including

13

how much was there in the stations and the handwashing stations. All of those were things that were part of your *essential job duties as an EHS manager.* Right?" *Id.* at 61:3-10 (emphasis added). Plaintiff responded, "Yes." *Id.* at 61:11. And Defense counsel then followed up, "and all of that had to be done on-site?", Plaintiff again responded, "Yes." *Id.* at 61:12-13. "An employer is not required to grant even a reasonable accommodation unless it would enable the employee to perform *all* of the essential functions of her position." *Jacobs*, 780 F.3d at 581. Here, Plaintiff's requested accommodation of being allowed to work from home (*see* Dkt. 27-17), was plainly not reasonable because, according to her own testimony, she would not have been able to accomplish numerous essential job duties and key responsibilities, as well as numerous other of her responsibilities listed above, all of which she testified required her to be on-site.[9] In any event, even if Plaintiff's request to work from home were reasonable—and it was not, for the reasons stated—Frito-Lay still would not have been required to grant such accommodation because it would have rendered Plaintiff unable to perform many essential functions of her position. *See Jacobs*, 780 F.3d at 581.

Plaintiff's argument that Frito-Lay failed to "engage in an interactive process" with her to determine what a reasonable accommodation might be fares no better. *See* Dkt. 28 at 24. As the Fourth Circuit has explained, "the interactive process is not an end in itself," and "an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable accommodation that would allow her to perform the

---

[9] Plaintiff's argument that "the exact same accommodation was routinely given to the other members of management in Lynchburg in the same time period as requested by [her]," Dkt. 28 at 23, does not help her case because it does not support an argument that any of *her* essential functions of her job could be accomplished off-site. Indeed, Plaintiff herself testified that they had to be done on-site. In any event, neither has Plaintiff provided any evidence that anyone else sharing any of those same essential job functions (much less all of them or even most of them) were allowed to work remotely. *See* Dkt. 28 at 9–10.

14

essential functions of the position." *Perdue*, 999 F.3d at 962 (citations omitted, cleaned up). That is the situation here. Plaintiff has only ever attempted to argue that a reasonable accommodation was that she be allowed to work remotely,[10] which, given the essential functions of her position as EHS manager, is not reasonable. Frito-Lay is entitled to summary judgment on Plaintiff's ADA failure to accommodate claim.

2.      *ADA – Discrimination & Retaliation*

Disability discrimination may be proven through direct or indirect evidence, or through the *McDonell Douglas* burden-shifting framework. *Jacobs*, 780 F.3d at 572. Here, there is no direct evidence of discrimination and so Plaintiff has opted to proceed under *McDonell Douglas*. *See* Dkt. 28 at 25.

To survive summary judgment on her ADA discrimination claim, Plaintiff "was required to produce evidence sufficient to demonstrate" (1) she "was a qualified individual with a disability"; (2) she "was discharged"; (3) she "was fulfilling [her] employer's legitimate expectations at the time of discharge"; and (4) "the circumstances of [her] discharge raise a reasonable inference of unlawful discrimination." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n.9 (4th Cir. 2004)); *see also* Dkt. 27 at 15 (citing *Reynolds*); Dkt. 28 at 24 (same). "Evidence of all four of these elements is necessary to survive summary judgment." *Reynolds*, 701 F.3d at 160. In addition, the ADA requires that a plaintiff show that her disability was the but-for cause of her

---

[10] *See, e.g.*, Dkt. 28 at 3 (asserting that on about March 22, 2022, Plaintiff "submitted a request for an accommodation, to-wit, a note from her doctor requesting that [she] be allowed to work from home."); *id.* at 8 ("This note is an accommodation request pursuant to the ADA …"); *id.* at 23–24 (contending that "the exact same accommodation was routinely given to the other members of management in Lynchburg in the same time period as requested by Ms. Crews-Sanchez").

termination. *Gonzalez v. Faithful+Gould, Inc.*, No. 1:17-cv-624, 2017 WL 6559905, at *3 (E.D. Va. Dec. 22, 2017) (citing *Gentry v. East West Partners Club Mgmt. Co., Inc.*, 816 F.3d 228, 235 (4th Cir. 2016)); *aff'd* 471 F. App'x 961 (4th Cir. 2018).

Frito-Lay argues that Plaintiff has failed to establish either the third or fourth elements of her ADA discrimination claim. Dkt. 27 at 15–16. According to Frito-Lay, at the time of her termination, "Plaintiff was neither in good standing with Frito-Lay nor satisfying its legitimate expectations," on the basis that she had "admitted disclosure of confidential information" and subsequently "misrepresent[ed] [ ] that disclosure." *Id.* at 16. As a result, Frito-Lay contends that the circumstances surrounding her termination do not "raise a reasonable inference of unlawful discrimination." *Id.* Plaintiff disagrees, arguing that she "successfully established a *prima facie* case and that the burden thus shifts to the defendant to provide a legitimate, nondiscriminatory reason for its action." Dkt. 28 at 24–25.

After a thorough review of the record, the Court concludes that Plaintiff's discrimination claim under the ADA fails. As an initial matter, Plaintiff has not offered even a scintilla of evidence that the "circumstances of [her] discharge raise a reasonable inference of unlawful discrimination." *See Reynolds*, 701 F.3d at 150. "[N]othing in the record even begins to suggest" that Ms. Wells or Ms. Fowler, who made the decision to terminate Plaintiff's employment, or anyone else at Frito-Lay, "possessed discriminatory animus linked to Plaintiff's medical condition." *See Harvey v. Jai Med. Ctr.*, No. 20-cv-2860, 2021 WL 4553235, at *4 (D. Md. Oct. 5, 2021). Indeed, Plaintiff testified that she formed her belief that Frito-Lay discriminated against her on the basis of her disability, solely because her request for an "accommodation was ignored and then [she] subsequently was terminated." Pl's Dep. 265:11-21, 266:9-19. Nothing else. *Id.* But these events were three-and-a-half months apart. And no evidence connected Plaintiff's accommodation request to her termination. *Cf. Ali v. BC Architects Eng'rs, PLC*, 832 F. App'x

16

167, 173 (4th Cir. 2020) (per curiam, unpublished) (holding that three months between race discrimination complaint and employer's decision not to select plaintiff for a position was "temporal proximity" that was "too tenuous to support a reasonable inference of causation").[11]

Plaintiff's ADA discrimination claim independently fails because the record evidence, taken in the light most favorable to Plaintiff, does not create a genuine issue of material fact as to whether Plaintiff "was fulfilling [her] employer's legitimate expectations at the time of discharge." *See Reynolds*, 701 F.3d at 150. There is no dispute that Plaintiff disclosed outside Frito-Lay its employee's (C.D.'s) name and information that he had been in close contact with a COVID-19-positive person and was under quarantine. Dkt. 27-10. Indeed, Plaintiff conceded that she had only ever been allowed to disclose confidential employee information in workers' comp cases in communications with doctors and attorneys—no other circumstances. Pl's Dep. at 105:9 – 106:16.[12] Her communications with Mr. Jones of the Hillcats—whomever initiated conduct—did not fall under those limited circumstances. It is also undisputed that Plaintiff did not seek permission first. The undisputed evidence also shows that Frito-Lay treated as confidential the identity of a person exposed to COVID-19 or who tested positive for the virus. *See* Wells Dep. at 23:18-23, 25:5-10; Dkt. 27-5 at 25:13-18, 26:17-23 ("Godlove Dep.").[13] Nor is there any dispute that Plaintiff herself characterized her sharing of C.D.'s COVID-19 exposure to

---

[11] *See also supra* n.9 (explaining how Plaintiff has not demonstrated that a work-from-home accommodation was given to other employees performing the same essential functions of the job that Plaintiff performed).

[12] Notably, Plaintiff didn't recall whether she did so in those limited circumstances with the employee's permission. Pl's Dep. at 106:2-4.

[13] Plaintiff didn't recall whether Frito-Lay treated such information as whether an employee had been exposed to a person who tested positive for COVID-19 was confidential, Pl's Dep. at 120:13 – 122:1; and did not introduce any contrary evidence sufficient to create a genuine issue of material fact on the issue whether Frito-Lay considered such information as confidential.

Mr. Jones as a "mistake." Wells Stmt. at 3; *see also* Pl's Dep. at 207:21 – 209:8.[14] Frito-Lay's

notice of termination to Plaintiff clearly stated that she was terminated for disclosing to a third-

party highly confidential information and misrepresenting important details to Ms. Fowler and

Ms. Wells during the investigation. Dkt. 27-13 at 1. In addition, Plaintiff's discrimination claim

fails for yet another, independent reason—that Plaintiff has not introduced evidence that would

tend to establish that her disability was at all causally linked to her termination, much less was a

"but-for" cause of her termination, as is required. *See Gentry*, 816 F.3d at 235–36; *Gonzalez*,

2017 WL 6559905, at *3.

Even if Plaintiff had established a *prima facie* case of discrimination in violation of the

ADA—and for the reasons stated above, she has not—her claim would still fail. Frito-Lay has

met its burden of articulating a legitimate, non-discriminatory  and non-retaliatory justification

for terminating Plaintiff's employment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 802–

03 (1973); *Perry v. Computer Sciences Corp.*, 429 F. App'x 218, 220 (4th Cir. 2011) (describing

burden shift in ADA disability discrimination case once a plaintiff has put forward a *prima facie*

case of discrimination); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142

(2000) (describing the employer's burden at this stage as "one of production, not persuasion; it

---

[14] Plaintiff's own characterization that it was a "mistake" to disclose such information belies her after-the-fact attempt to rely on a PepsiCo policy allowing "*PepsiCo*" to "transfer personal information to third parties as required by law, to protect PepsiCo's legal rights or to facilitate the acquisition or disposition of PepsiCo businesses or property, or where a person's health or safety is threatened." *See* Dkt. 28 at 5; Dkt. 27-15 at 21. Indeed, it is unsurprising that Plaintiff testified that did not know about the existence of this provision, or previously attempt to invoke it in this case. *See* Pl's Dep. at 120:13 – 121:21; Dkt. 29 at 4. This line plucked from the Handbook, especially when viewed in its full context, Dkt. 27-15 at 21, falls far short of evidence such as would give rise to a genuine issue of material fact whether Plaintiff was fulfilling Frito-Lay's legitimate expectations. Nor, at a later stage of the *McDonnell Douglas* analysis, would it tend to provide any basis to conclude that Frito-Lay's proffered explanation for Plaintiff's termination was pretext.

can in volve no credibility assessment") (cleaned up). Here, Frito-Lay articulated legitimate, non-discriminatory and non-retaliatory reasons in its notice of termination, namely that Plaintiff had violated her duty not to disclose confidential information about employees to a third party, and also that Plaintiff was found to have misrepresented important details of the allegations during their investigation. *See* Dkt. 27-13 (notice of termination). Those were included in the termination notice, as well as consistently provided in contemporaneous descriptions of the statements by Ms. Fowler and Ms. Wells and in their subsequent deposition testimony. *See, e.g.*, Fowler Stmt. at 3–4; Wells Stmt. at 2–3; Fowler Dep. at 33:4-15; Wells Dep. at 19:24 – 20:1, 25:23 – 26:1.

The burden then turns back to Plaintiff to demonstrate pretext. "A plaintiff can demonstrate pretext by showing that the alleged non-discriminatory 'explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of [disability] discrimination.'" *Amos v. Welles*, 477 F. Supp. 3d 408, 417 (E.D.N.C. 2020) (quoting *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir. 2004)). And "a reason cannot be proved to be 'a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (internal quotation marks omitted; emphasis in original). The question is whether Plaintiff has established a genuine issue of material fact on the issues such that a reasonable juror could conclude that Frito-Lay's proffered reason was unworthy of credence. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217–18 (4th Cir. 2007). Plaintiff has not demonstrated that there exists a genuine issue of material fact whether Frito-Lay's proffered reasons for termination were false or unworthy of credence, or, in any event, that discrimination was the real reason for her termination. No reasonable juror could find for Plaintiff on the issue of pretext.

Plaintiff's primary argument as to falsity is a red herring. *See* Dkt. 28 at 15–19; *see also* Dkt. 29 at 2–3. Frito-Lay stated that it terminated Plaintiff for disclosing to a third-party highly confidential information and misrepresenting important details to Ms. Fowler and Ms. Wells during the investigation. Dkt. 27-13 at 1. There was no dispute that Plaintiff disclosed to a third-party C.D.'s name and that he was potentially exposed to COVID-19; and Ms. Wells and Ms. Fowler expressed concern about the truthfulness and candor of Plaintiff's *initial* representations to them,[15] not (as Plaintiff's counsel argues now), Plaintiff's *later* representations in her written statement after she was sent home. Moreover, significantly, the Court's assessment of pretext depends upon the "perception of the decisionmaker." *See Holland*, 487 F.3d at 217; *see also Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) ("[W]hen an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, it is not [the court's] province to decide whether the reason was wise, fair, or even correct … so long as it truly was the reason for the plaintiff's termination.") (cleaned up). Plaintiff hasn't introduced any evidence that would call Frito-Lay's stated reasons for its decision to terminate her position into doubt or that would create a genuine issue of material fact as to whether Frito-Lay's decision was worthy of credence. Frito-Lay's position was consistent—that its management (i.e., Ms. Wells as well as Ms. Fowler), saw it a significant breach of confidentiality that Plaintiff disclosed to a third-party the information about C.D. and that he may have been exposed to COVID-19 and thus under quarantine; and that they viewed Plaintiff as having demonstrated a lack of candor (if not outright misrepresentations) in explaining to them the circumstances of her communication to

---

[15] *See, e.g.*, Wells Stmt. at 2 ("After talking with [Mr. Jones] and reading the email he forwarded to me I contacted [Ms. Fowler] and let her know [Plaintiff] started the conversation and every[thing] happened opposite of what she said. I also mentioned she referred to herself as a Director of Frito."); Fowler Stmt. at 3 (description of meeting with Ms. Wells and Plaintiff).

Mr. Jones, as well as holding herself out to Mr. Jones as a position senior than that which she held—any one of which would constitute a legitimate, non-discriminatory reason for termination. And Plaintiff has offered no evidence that would create a genuine dispute of material fact that any of them  (much less all) were pretextual grounds for a discriminatory termination. "An employer does not violate the ADA when it 'discharges an individual based upon the employee's misconduct.'" *Amos*, 477 F. Supp. 3d at 416 (citing *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 429 (4th Cir. 1999)). Nor has Plaintiff offered any evidence to create a genuine issue of material fact whether discrimination was the real reason behind Frito-Lay's decision to terminate her employment. *See Holland*, 487 F.3d at 217. As stated above, there's no evidence to support that.

Plaintiff's claim that Frito-Lay retaliated against her in violation of the ADA fails as well. "To establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) she engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds*, 701 F.3d at 154. A plaintiff may attempt to demonstrate that a protected activity caused an adverse action through "facts that suggest that the adverse action occurred because of the protected activity," or the existence of a "sufficient temporal proximity" between the adverse act and the protected activity—or some combination of the two. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021) (cleaned up). And while there is no "bright line rule for temporal proximity," the Fourth Circuit has concluded that "a three-month period between the protected activity and the adverse action does not support a finding that there is a causal link," without more evidence that would serve to connect the two. *See id.* at 127. And here, there is no evidence that connects the two.

Plaintiff argues "other managers were routinely allowed accommodations whereas she was disallowed," and she believes that the "cited reasons for [Plaintiff's] termination cannot be

supported by the evidence in this case," and thus, in her view, that she has sufficient evidence to establish a claim for retaliation. Dkt. 28 at 25. The argument fails for the reasons stated above. Plaintiff herself testified that she had myriad, core job responsibilities that required her to be at the Frito-Lay facility *in person*. She agreed, they were essential parts of her position. Whether another manager who was not engaged in any of those *in-person* responsibilities (much less all of them), may have been permitted to work from home is of little moment. And there's just no evidence that anyone with any similar essential functions was permitted to work from home, much less all of them. In that respect, or in any other respect, there's no evidence of retaliation. Plaintiff's ADA retaliation claim fails as well.

3.    *Virginia Code § 40.1-51.2:1 Retaliation*

Plaintiff also claims that Frito-Lay has retaliated against her in violation of Virginia Code § 40.1-51.2:1. Dkt. 1 ¶¶ 38–46 (Count One). Frito-Lay has moved for summary judgment on this claim. Dkt. 27 at 19–22; Dkt. 29 at 5–7.

Virginia Code § 40.1-51.2:1 provides that "[n]o person shall discharge or in any way discriminate against an employee because the employee has filed a safety or health complaint or has testified or otherwise acted to exercise rights under the safety and health provisions of this title for themselves or others." "[A] plaintiff proceeding under this statute must prove that his termination 'would not have taken place 'but for' [his] engagement in protected activity." *Clark v. General Internal Medicine Grp., Inc.*, No. 1:20-cv-1332, 2021 WL 3669322, at *8 (E.D. Va. Aug. 18, 2021) (quoting 16 VAC 25-60-110(A)).

An employee "who believes that he or she has been discharged or otherwise discriminated against by any person in violation of § 40.1-51.2:1 may, within 60 days after such violation occurs, file a complaint with the Commissioner [of Labor and Industry] alleging such discharge or discrimination." Va. Code § 40.1-51.2:2(A). Here, there is no dispute that Plaintiff

22

followed that prerequisite to filing a claim. Dkt. 27 at 20 n.15. The Commissioner found that, while "it appears that [Plaintiff] engaged in a protected activity (conducting contact tracing and informing management of her findings) … there must also be a nexus or connection between the protected activity and the alleged discrimination." Dkt. 1-2 at 2. The Commissioner found that Defendant's termination letter stated that Plaintiff "violated the company's global code of conduct by releasing confidential information about another employee," and "misrepresent[ed] details about the allegations." *Id.* Thus, there was "no information presented that would serve to support an argument that the company's termination of [Plaintiff's] job was pre-textual in any way and directly related to her carrying out her standard safety and health job duties over the previous months, including contact tracing." *Id.*

The Court determines that Plaintiff has failed to demonstrate the existence of a genuine issue of material fact on this claim, that would preclude the Court's award of summary judgment to Frito-Lay. The Court will assume without deciding that Plaintiff "acted to exercise rights under the safety and health provisions of this title" for herself or others. *See* Va. Code § 40.1-51.2:1. Regardless, the summary judgment record demonstrates that Frito-Lay terminated Plaintiff not for engaging in protected activity, but for disclosing confidential information about company employees to persons outside the company without permission, and in any event, then misrepresenting the circumstances underlying the event to her superiors or, at best, showing them a lack of candor regarding the same. *See supra* at 15–22.

A recent case in the context of the COVID-19 pandemic illustrates the point that this Virginia state statutory protection against retaliation does not mean that an employee cannot be terminated for other reasons, besides engaging in protected activity. In *Clark v. General Internal Medicine Group*, the plaintiff was a physician assistant hired to work at the defendant's urgent care clinic. After the outbreak of COVID-19, the plaintiff repeatedly contacted his superiors and

support staff in manner that was characterized as "rather aggressive," by "raising his voice," as well as interrupting ongoing meetings, to complain about a lack of N95 protective masks or other PPE. *See* 2021 WL 3669322, at *1–5. Other employees found the plaintiff's behavior "unprofessional, belligerent, and causing chaos." *Id.* at *5. After the plaintiff was later terminated, he sued his former employer, claiming retaliation under Va. Code § 40.1-51.2:1, among other things. *See id.* at *8–9. In that case, the court explained that, while the plaintiff's "actions in requesting a mask and reporting concerns about the availability of PPE may amout to protected activity under Section 40.1-51.2:1, *the manner in which* he engaged in this activity is not protected." *Clark*, 2021 WL 3669322, at *9 (citing *Weiters v. Roper Hosp., Inc.*, 58 F. App'x 40, 45 (4th Cir. 2003)) (emphasis in original). Accordingly, the court held that the record "fully support[ed] the defendant's conclusion that plaintiff's employment was terminated not in retaliation for his engaging in protected activity, but for his unprofessional conduct," and awarded the defendant summary judgment on this claim. *Id.* at *9.

So too here, the Court concludes there is no genuine issue of material fact that Plaintiff's employment was terminated not in retaliation for her engaging in any protected activity, but rather, for the manner in which she engaged in such activity—*i.e.*, Plaintiff's disclosure of confidential information about another employee to a third-party, without prior permission, and exhibiting a lack of candor to her superiors in the course of the investigation of the incident. Plaintiff's retaliation claim under § 40.1-51.2:1 fails.

4.     *Virginia Code § 40.1-27.3 Retaliation*

Plaintiff's last claim is for retaliation in violation of Va. Code § 40.1-27.3. Plaintiff alleged in her complaint that alleged that she engaged in protected activity by reporting a violation of state or federal law or regulation in good faith. Dkt. 1 ¶¶ 47–51. Frito-Lay has moved for summary judgment on that claim as well.

Virginia Code § 40.1-27.3 provides, in relevant part, that "[a]n employer shall not discharge, discipline, threaten, discriminate against, or penalize an employee, or take other retaliatory action … because the employee … in good faith reports a violation of any federal or state law or regulation to a supervisor or to any governmental body or law-enforcement official." But this provision simply doesn't cover the facts of this case. While Plaintiff argues broadly that "her *disclosures*" related to C.D. and "her daily adherence to OSHA regulations regarding safety at the workplace qualified as protected activities pursuant to [§ 40.1-27.3]," Dkt. 28 at 22–23 (emphasis added), this provision does not insulate Plaintiff's conduct of disclosing confidential employee health information to the President and General Manager of the Lynchburg Hillcats— who was not Plaintiff's supervisor, or a governmental or law enforcement official, Va. Code § 40.1-27.3. As described above, Frito-Lay terminated Plaintiff for disclosure to Mr. Jones of that information, and for Plaintiff's lack of candor in describing the circumstances of that disclosure to Plaintiff's superiors at Frito-Lay. As above, even if Plaintiff engaged in protected activity, which the Court need not decide, "*the manner in which* [she] engaged in this activity is not protected," in this case. *Clark*, 2021 WL 3669322, at *9 (citing *Weiters*, 58 F. App'x at 45). Plaintiff has offered no evidence that would give rise to a genuine issue of material fact that Frito-Lay terminated her in retaliation for any protected activity. This claim, like the others, fails.

<u>Conclusion</u>

For the reasons set forth above, the Court has concluded that Plaintiff has not introduced any evidence that would give rise to a genuine issue of material fact on any of her claims. As such, the Court will, in an accompanying Order, grant Frito-Lay's motion for summary judgment and award summary judgment to Frito-Lay.

The Clerk of Court is directed to send this Memorandum Opinion and accompanying

Order to the parties.

ENTERED this ___15th___ day of July, 2022.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE